UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

HEVY JOUTHE, by his Mother and Natural
Guardian, NICOLE JOUTHE, and by
NICHOLE JOUTHE, Individually,

       Plaintiffs,

   -against-

THE CITY OF NEW YORK, Police Officer
WILLIAMS (Shield No. 7738), and other
Police Officers JOHN and JANE Doe, the
Names Unknown at This Time, Individually
and in Their Official Capacities, LONG
ISLAND JEWISH MEDICAL CENTER,
LONG ISLAND JEWISH HOSPITAL,
NORTH SHORE-LONG ISLAND JEWISH
HEALTH SYSTEM, CHRISTOPHER
JOHNSON also known as Chris Johnson,
DONOVAN GOLDBOURNE, JAMES
RANDAZZO, and other unknown,

      Defendants.
--------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**05-CV-1374 (NGG) (VVP)**

NICHOLAS G. GARAUFIS, United States District Judge.

  Plaintiffs Hevy Jouthe ("Mr. Jouthe"), by his mother and guardian ad litem Nicole Jouthe

("Ms. Jouthe"), and Ms. Jouthe, individually, bring this action pursuant to 42 U.S.C. § 1983

against the City of New York, Police Officer Michael Williams, and two unnamed police officers

(collectively, "City Defendants"), as well as the Long Island Jewish Medical Center, Long Island

Jewish Hospital, North Shore-Long Island Jewish Health System, Christopher Johnson, Donovan

Goldbourne, James Randazzo, and other unknown defendants (collectively, "Hospital

Defendants").  Plaintiffs' Complaint alleges sixteen claims for relief.  In particular, Plaintiffs

allege that all Defendants violated Mr. Jouthe's constitutional rights under the Fourth and

Fourteenth Amendments to be free from false arrest, malicious prosecution, malicious abuse of process, and excessive force; that Defendants conspired to violate these rights; and that the City of New York is liable. Plaintiffs also allege other "deprivations of rights under 42 U.S.C. 1983," invoking the First Amendment, Fifth Amendment, and Eighth Amendment. In addition to the claims under Section 1983, Plaintiffs allege ten state-law claims against all Defendants. The City Defendants and Hospital Defendants brought motions for summary judgment.[1] (Docket Entries #30, 31.) For the reasons that follow, both Motions are GRANTED.

## I.      BACKGROUND

As a preliminary matter, the court notes that Plaintiffs' responses to Defendants' 56.1 Statements were not in compliance with the requirements of Local Civil Rule 56.1, which made it difficult for the court to determine which facts are in dispute.[2] The court has performed an independent review of the evidence cited by the parties in their 56.1 Statements and memoranda of law. See Local Civ. R. 56.1(d); Watt v. New York Botanical Garden, No. 98-CV-1095 (BSJ), 2000 WL 193626, at *1 n.1 (S.D.N.Y. Feb. 16, 2000) (noting that "where there are no citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion."). Unless otherwise indicated, the following facts are either undisputed or not adequately disputed by admissible evidence.

---

[1] The Hospital Defendants filed a Motion to Dismiss pursuant to Rule 12(b)(6) but subsequently informed the court that they had inadvertently moved for dismissal instead of summary judgment. On February 2, 2008, the court converted the Hospital Defendants' Motion to Dismiss to a Motion for Summary Judgment. (Memorandum & Order ("Feb. M&O") (Feb. 8, 2008)) (Docket Entry #45).)

[2] This court previously addressed Plaintiffs' failure to comply with Local Civil Rule 56.1 in responding to the City Defendants' 56.1 Statement and the Hospital Defendants' failure to submit a 56.1 Statement containing numbered paragraphs. (See Feb. M&O 4.) The court directed the Hospital Defendants to submit a revised 56.1 Statement and Plaintiffs to respond in corresponding numbered paragraphs. (Id.) Plaintiffs' response to the revised statement was numbered but confusing in that its lengthy list of "additional material facts" addressed many of the same facts presented in the Hospital Defendants' numbered paragraphs. (Docket Entries #49, 50.)

## A.    Mr. Jouthe's Admission to Long Island Jewish Medical Center

At approximately 10 a.m. on March 17, 2004, Nicole Jouthe ("Ms. Jouthe") admitted her seventeen-year old son, Hevy Jouthe ("Mr. Jouthe") to Long Island Jewish Medical Center ("LIJMC") for medical treatment.  (City Def. 56.1 Statement ¶¶ 6, 9 (Docket Entry #32).)  At that time, Mr. Jouthe weighed 350 pounds, and was 6'5".  (Id. ¶ 7.)  According to Ms. Jouthe, that morning, Mr. Jouthe had been banging at a door, cursing, and claimed to see a woman in the refrigerator.  (Hosp. Def. Rev. 56.1 Statement ¶ 1 (Docket Entry #47).)  Mr. Jouthe's family called 911 for an ambulance.  (Id.)  The ambulance arrived at LIJMC at 9:59 am.  Mr. Jouthe was triaged and registered by 10:16 a.m.  (Id.)

Ms. Jouthe signed a General Admission/Treatment Consent form and Voluntary Request for Hospitalization.  (Id. ¶ 2.)  According to what Ms. Jouthe wrote in the Voluntary Request for Hospitalization, Mr. Jouthe had been "acting up" for two to three weeks, and that morning he had been throwing things, being loud, and saying things that "did not make sense[,] like people [were] out to get him." (City Def. 56.1 Statement ¶ 10.)  The Voluntary Request for Hospitalization further notes that, according to Ms. Jouthe, Mr. Jouthe's behavior "had changed completely" and he was afraid that she was "going to poison him."  (Id. ¶ 11.)

Mr. Jouthe was evaluated and given a "level 2" designation, meaning that at the present time, he was not an acute threat to himself or others but needed to be seen in an urgent manner. (Deposition of Shelley Rothberg ("SR Dep.") 10 (Pl. Opp. Ex. C) (Docket Entry #50).)  At 10:30 a.m., Mr. Jouthe was placed into a "consult room" with a security hold.  (Hospital Def. 56.1 Statement ¶ 3.)  A security hold involves constant observation of a patient.  (Id.)  At 10:45 a.m., Mr. Jouthe was seen by the Pediatric Emergency Department resident physician and diagnosed

with hallucinations/aggressive behavior and a superficial right toe laceration.[3]  (Id.)  The physician ordered psychiatric consultation and cleaning and dressing of the toe laceration.  (Id.)

Mr. Jouthe was seen several times in the late morning and afternoon.  He was described in his medical records as "calm and cooperative" while in the Emergency Room.  (LIJMC Chart (Hosp. Def. Mot. Ex. C) (Docket Entry #31).)  At approximately 11 a.m., Mr. Jouthe was examined by Dr. Jonathan Samuels.  (Hosp. Def. Rev. 56.1 Statement ¶ 4.)  Dr. Samuels diagnosed him with psychotic disorder and recommended in-patient hospitalization.  (Id.)  As there were no available beds, Mr. Jouthe remained in the consult room with a security hold in place.  (Id.)  Dr. Samuels conferred with Dr. Robert Dicker, the supervising attending psychiatrist for children and adolescents.  (Id.)  Dr. Dicker concurred with Dr. Samuels's diagnosis and recommendations.  (Id.)  At 11:30 a.m., Dr. Joy Nagelberg, the Pediatric Emergency Department attending physician, saw Mr. Jouthe and ordered a toxicology screen, admitting labs, and admission to the adolescent psychiatric service.  (Id. ¶ 5.)  At 12:40 p.m., Mr. Jouthe was described as alert and cooperative.  (Id. ¶ 6.)  Mr. Jouthe remained on security hold. (Id.)

At 5:30 p.m., Mr. Jouthe was still awaiting admission to adolescent psychiatry in-patient unit.  (Id. ¶ 7.)  He asked to go outside and was described as becoming agitated.  (Id.)  When he was informed that he was not permitted to smoke a cigarette he returned to the consult room. (Id.)  He returned to the room and sat on the bed calmly and quietly.  (LIJMC Chart.)  He was given a TV remote and Nintendo, and appeared "calm without significant agitation or aggression noted."  (Id.)

---

[3] It is undisputed that Mr. Jouthe injured his toe prior to his arrival at the hospital.  (City Def. 56.1 Statement ¶ 49.)

### B.     The Hallway Incident

At 6:00 p.m., Mr. Jouthe was pacing outside the consult room, and he again became agitated.  (Hosp. Def. Rev. 56.1 Statement ¶ 8; City Def. 56.1 Statement ¶ 12.)  Mr. Jouthe's medical records describe Mr. Jouthe's behavior as "swinging his arms" and "approaching to hit passerbys" (LIJMC Chart), whereas Ms. Jouthe testified that he was not swinging his hands, clenching his fists, or punching outwards and was "dancing" and "singing" (First Deposition of Nicole Jouthe ("1NJ Dep.") 102-103 (Pl. Opp. Ex. B)).

Mr. Jouthe then tried to leave the hospital, and as Ms. Jouthe testified, he was "fighting his way to get out."  (City Def. 56.1 Statement ¶¶ 12, 13.)  Hospital staff and Ms. Jouthe tried to convince Mr. Jouthe to go back to the consult room, but Mr. Jouthe did not listen.  (1NJ Dep. 101-102.)  It is undisputed that Mr. Jouthe began moving rapidly down the hall toward the treatment area of the emergency room and exit, though the parties dispute whether Mr. Jouthe was "jogging" or "running."  (LIJMC Chart; Second Deposition of Nicole Jouthe ("2NJ Dep.") 21 (Pl. Opp. Ex. M).)  A security alarm was pushed, which signaled the security staff to the emergency room.  (Hosp. Def. Rev. 56.1 Statement ¶ 8.)

Several hospital staff members pursued Mr. Jouthe and attempted to restrain him in the hallway.  (Id.)  During the restraint, a struggle ensued and several staff members sustained injuries.  It is undisputed that Mr. James Randazzo sustained a fractured skull and was rendered unconscious; Mr. Christopher Johnson sustained bruising, swelling, contusions to the left elbow and wrist; and Mr. Donovan Goldbourne sustained substantial pain and swelling to the head and body.  (City Def. 56.1 Statement ¶¶ 29-31.)  The police were summoned but did not arrive until after the incident involving the hospital staff and Mr. Jouthe.  (Id. ¶ 14.)  The parties' accounts of

the incident diverge with respect to whether Mr. Randazzo's injuries were sustained in the course of restraining Mr. Jouthe.

Ms. Jouthe's account of the incident is as follows. She testified that two "security guards" pursued Mr. Jouthe from one direction, and three or four others came at him from the other direction.[4] (2NJ Dep. 22-24, 34.) Several staff members grabbed Mr. Jouthe and pushed him against the wall to restrain him. (Id. at 34-35.) She testified that Mr. Jouthe was "trying to get away, like move himself around," and he was shaking his body with his arms raised above his head. (Id. at 36-37.) She testified that the staff members "tried to put [Mr. Jouthe] down so they could put his arm in the back and handcuff him so they could walk him back to emergency." (Id. at 39.) She testified that she did not see hospital staff hit, punch, or kick Mr. Jouthe, and that it appeared just that they were trying to stop him from moving, and that they were having difficulty bringing him down. (Id. at 39-40.) She testified that it did not look like they were trying to injure Mr. Jouthe in any way. (Id. at 40.) Ms. Jouthe also testified that a security guard slipped and fell (id. at 36), presumably referring to Mr. Randazzo. She also testified that that particular guard did not have any contact with Mr. Jouthe before he fell; she stated that "he just fell" and that he was not pushed by Mr. Jouthe. (Id.) She testified that one of the hospital staff members involved said to "call the cops." (City Def. 56.1 Statement ¶ 15.)

As noted above, the account of the incident by hospital staff differs from Ms. Jouthe's account primarily with regard whether Mr. Randazzo was injured in the course of restraining Mr. Jouthe. Mr. Johnson, the unit service assistant who was involved in restraining Mr. Jouthe, testified that he was in his office when heard the panic alarm go off. (CJ Dep. 7.) He went to his

_____

[4] While Ms. Jouthe's testimony refers repeatedly to the hospital staff members as "security guards," only Mr. Randazzo was employed as a security guard at LIJMC. The parties do not dispute that Mr. Johnson was employed as a "unit service assistant" in the emergency department at LIJMC, which involves "light housekeeping duties," ordering medical supplies, and transporting patients; and Mr. Goldbourne was employed as an "emergency technician" at LIJMC. (Deposition of Christopher Johnson ("CJ Dep.") 5 (Pl. Opp. Ex. I).)

office door and saw Mr. Jouthe at the end of the hallway with Mr. Goldbourne, an emergency technician, who yelled for help. (Id.) He testified that by the time he got to the hallway, "Hevy took off. Donovan [Goldbourne] pursued behind him, and then I started going." (Id. at 7-8.) He began walking, then started "jogging, running after" Mr. Jouthe. (Id. at 7-8.) He testified that he saw "Donovan [Goldbourne], Jimmy Randazzo, and Mr. Jouthe sandwiched together up against the wall," with Mr. Jouthe between Mr. Randazzo and Mr. Goldbourne. (Id. at 22-23.) He testified that he observed Mr. Jouthe trying to break free from Mr. Randazzo and Mr. Gouldbourne, and then he stepped in to grab Mr. Jouthe's right arm with both hands. (Id. at 24-25.) He testified that Mr. Jouthe moved his folded left arm toward his chest and opened his arm into Mr. Randazzo, "like trying to push him away," and Mr. Randazzo fell to the ground, hitting his head on the floor. (Id. at 25-27.) He also testified that after Mr. Randazzo fell to the floor, "there was more security involved" and that "we all went to the floor, meaning Donovan, myself and Hevy, and somehow the security staff. And we got to the floor and they started restraining him." (Id. at 27.)

Similarly, Mr. Goldbourne testified that he was labeling blood in the hallway of the emergency room when he heard the panic alarm go off and saw Mr. Jouthe running down the hallway, about two feet away from him. (Deposition of Donovan Goldbourne ("DG Dep.") 33-34, 38-39 (Pl. Opp. Ex. J).) He testified that he called for help, told Mr. Jouthe to stop running, and chased Mr. Jouthe from the emergency room through a set of double doors. (See id. at 38-39, 43, 45-47.) He testified that Mr. Jouthe pushed Mr. Randazzo into the wall. (Id. at 47.) He testified that he, Mr. Randazzo, and Mr. Johnson tried to restrain Mr. Jouthe and "couldn't control him," and that Mr. Jouthe hit him in the side of the head during the course of the restraint. (See id. at 50, 56, 58.)

## C.     Police Arrival and the Arrest of Mr. Jouthe

New York Police Department ("NYPD") Officer Michael Williams ("Officer Williams") responded to a radio call regarding an EDP – an "emotionally disturbed person" – and arrived with his partner at the emergency room.  (City Def. 56.1 Statement ¶¶ 18-20.)  He testified that he spoke to several people about the incident when he arrived at the emergency room.  It is undisputed that he learned that Mr. Randazzo was unconscious as a result of the injury to his skull.  (Id. ¶ 23.)  Officer Williams testified that he spoke to, but did not take a written statement from, a tall, white male nurse who stated that "three people working for Long Island Jewish Center were beat up."  (Id. ¶ 21; Deposition of Michael Williams ("MW Dep.") 25 (Pl. Opp. Ex. N).)  He also testified that he spoke with Mr. Johnson and Mr. Goldbourne about the incident. (City Def. 56.1 Statement ¶ 22.)   Officer Williams testified that Mr. Johnson complained of pain in his arm, wrist, and ribs, and told him that he was "beat up."[5]  (Id. at 37-39.)  He also testified that Mr. Goldbourne told him that he had been "beaten up," and that his arm and ribs were hurt.[6] (MW Dep. 33.)  Ms. Jouthe similarly testified that hospital staff told the police that Mr. Jouthe "push[ed] the security guard and caus[ed] injury to him."  (City Def. 56.1 Statement ¶ 17.) Officer Williams testified that before he arrested Mr. Jouthe, Mr. Johnson and Mr. Goldbourne indicated to him that they wanted to press charges against Mr. Jouthe, although Mr. Johnson testified that he later changed his mind and told Officer Williams that.  (MW Dep. 118-19; CJ Dep. 37.)

Officer Williams also testified that no one from the hospital told him to arrest Mr. Jouthe, and that a female who "might be management" at the hospital said that Mr. Jouthe should not be

---

[5] Mr. Johnson testified that he did not recall specifically what he said to police officers.  While he testified that he did not explicitly state to Officer Williams that Mr. Jouthe "beat him up," he testified that while he was receiving medical treatment for his injuries in the emergency room, Officer Williams asked him to describe what happened, and that he described the events the same way that he described them during his deposition, discussed above.  (CJ Dep. 27-31.)  Plaintiffs do not dispute that Mr. Johnson told Officer Williams his version of events.  (Pl. Opp. 13.)
[6] Mr. Goldbourne testified that he told Officer Williams that the "patient hit me in the head."  (DG Dep. 60.)

arrested because he is an EDP.   (MW Dep. 52, 117-118.)  A doctor at LIJMC, Dr. Diana Crevi, testified that she told a police officer that Mr. Jouthe was a psychiatric patient awaiting admission and that she doubted whether Mr. Jouthe could be arrested because he may not have understood what he had done.  (Deposition of Diana Crevi ("DC Dep.") 37 (Pl. Opp. Ex. D).)

Officer Williams arrested Mr. Jouthe and put one handcuff on Mr. Jouthe's right hand. (City Def. 56.1 Statement ¶ 24.)  He arrested Mr. Jouthe for second- and third-degree assault in violation of N.Y. Penal Law §§ 120.05 and 120.00, and second-degree harassment in violation of N.Y. Penal Law § 240.26.  (City Def. 56.1 Statement ¶ 26.)  Officer Williams testified that he arrested Mr. Jouthe on the basis of what he learned in his conversations with staff regarding the incident in the hallway, and on the injuries of Mr. Randazzo.  (MW Dep. 120, 119.)

Mr. Jouthe was taken back to the consult room and placed on a stretcher in four-point leather restraints.[7]  (Hosp. Def. Rev. 56.1 Statement ¶ 8.) He was given Ativan intramuscularly to subdue him.  (Id.)  According to the medical records, Mr. Jouthe was observed to be "very alert/coherent affect & stating [that he] didn't want to hurt anyone/didn't punch anyone." (LIJMC Chart.)

Mr. Jouthe remained in four-point restraints for several hours.  At 7:30 p.m., Mr. Jouthe remained handcuffed to a stretcher while he remained in four-point restraints.  (Hospital Def. Rev. 56.1 Statement ¶ 9.)  According to Mr. Jouthe's medical records, hospital staff observed that initially, the police would not let them into the room.  (LIJMC Chart.)  A nurse testified that she could observe Mr. Jouthe through the window and noticed that "he was pink and his extremities were all pink therefore, his circulation was good," and that she was let into Mr. Jouthe's room five minutes later, at 7:35 p.m.  (SR Dep. 32, 34.)  Dr. Crevi testified that the

---

[7] It is unclear from the record whether Mr. Jouthe was placed in restraints before or after being handcuffed by Officer Williams, although it is undisputed that Mr. Jouthe was in restraints while he was in handcuffs.

police refused to remove Mr. Jouthe's handcuffs. (DC Dep. 38-39.) Officer Williams testified that he was not asked to loosen the handcuffs or the restraints by any medical personnel. (City Def. 56.1 Statement ¶ 25.) The restraint flow sheet documents that Mr. Jouthe was checked frequently for behavior, safety, and comfort. (Hosp. Def. Rev. 56.1 Statement ¶ 9.) At 10:30 p.m., the psychiatric resident physician ordered that the restraints be discontinued. (Id.) The restraints were removed by 10:50 p.m. (Id.) Mr. Jouthe was observed to be cooperative and compliant with medication. (Id.) Ms. Jouthe testified that before Mr. Jouthe went to sleep, he complained that his jaw hurt. (2NJ Dep. 42.) She also testified that medical staff treated Mr. Jouthe's bleeding toe by washing it and wrapping it. (Id. at 53-54.)

### D. Mr. Jouthe's Transfer to Hillside Hospital and Subsequent Events

On March 18, 2004, Mr. Jouthe was transferred to the adolescent psychiatry in-patient unit at Hillside Hospital.[8] (Hospital Def. Rev. 56.1 Statement ¶ 10.) That day, he was charged with three counts of violating N.Y. Penal Law § 120.05, second-degree assault. (City Def. 56.1 Statement ¶ 27.) Officer Williams signed the criminal complaint, which was drafted by the District Attorney's Office.[9] (Crim. Compl. (Pl. Opp. Ex. A); MW Dep. 55, 74.) The prosecutor's intake report indicated that Mr. Randazzo, Johnson, and Mr. Goldbourne wanted to prosecute (City Def. 56.1 Statement ¶ 28), although Mr. Johnson testified that he told the prosecutor that he had changed his mind and no longer wanted to press charges (CJ Dep. 32).

---

[8] Other than the Hospital Defendants' affidavit stating that LIJMC is a member of the North Shore-Long Island Jewish Health System (Hosp. Def. Mot. Ex. D), the parties' submissions do not explain the connection between the entities listed as Hospital Defendants, or the relationship between those entities and Hillside Hospital. To clarify, the court takes judicial notice of the North Shore-Long Island Jewish Health System's website, which states that LIJMC is "comprised of three components: Long Island Jewish Hospital, Schneider Children's Hospital and The Zucker Hillside Hospital." (Welcome to Long Island Jewish Medical Center, at http://www.northshorelij.com/body.cfm?ID=60 (last accessed March 10, 2009).) The emergency room at Long Island Jewish Medical Center is part of Long Island Jewish Hospital; Hillside Hospital is at a separate location. (See id.)

[9] The Criminal Complaint states that Officer Williams was informed by Mr. Johnson about the incident; describes Mr. Johnson's version of events, including that Mr. Johnson, Mr. Goldbourne, and Mr. Randazzo struggled to restrain Mr. Jouthe and that "all four persons struggled and then fell to the ground"; and describes the injuries of Mr. Johnson, Mr. Goldbourne, and Mr. Randazzo. (Crim. Compl.)

It is undisputed that while Mr. Jouthe was in the in-patient unit at Hillside from March 17 to March 24, 2004, he remained in handcuffs while under medical supervision. (City Def. 56.1 Statement ¶ 53.) Hospital staff checked the handcuffs to make sure they did not restrict Mr. Jouthe's wrists too much. (Id. ¶ 54.) Mr. Jouthe testified that the handcuffs were too tight, that he had cuts and bruises to his wrists from being handcuffed, and when asked to describe his injuries, he stated that his wrist was "red and looked like – that was about it just red it was too tight on my wrist and it hurt," and that the cuts and bruises "healed that was such a long time ago." (Dep. of Hevy Jouthe ("HJ Dep.") 228-229 (Pl. Opp. Ex. K).) Mr. Jouthe testified that he asked for the handcuffs to be loosened and "they kept loosening it and it was still tight." (Id. at 29.) Mr. Jouthe did not testify as to whether the alleged injuries were sustained on March 17, 2004, or after his transfer to the in-patient unit. Nor did he testify as to when and whom he asked for the handcuffs to be loosened. Mr. Jouthe's medical records indicate that no redness or soreness was observed to Mr. Jouthe's skin while he was at the in-patient unit. (City Def. 56.1 Statement ¶ 54.)

Mr. Jouthe was arraigned at the hospital on March 24, 2004, in the in-patient unit. (Id. ¶ 35.) Mr. Jouthe's family posted bail on March 25, 2004 and Mr. Jouthe went home that day. (Id. ¶ 36.) It is undisputed that Mr. Jouthe was never taken to a police station, a holding cell, or a jail. (Id. ¶¶ 38-40.) The charges against Mr. Jouthe were eventually dismissed by the District Attorney's Office. (Id. ¶ 38.)

## II.   STANDARD

Summary judgment is appropriate when no genuine issue of material fact exists. See Fed. R. Civ. P. 56(c); D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998), cert. denied, 524 U.S. 911 (1998). The burden of showing the absence of any genuine dispute as to a

material fact rests on the party seeking summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is 'no genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A moving party "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223-24 (2d Cir. 1994). "[C]onclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment." Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996) (citations omitted).

## III. DISCUSSION

The court first addresses the claims under 42 U.S.C. § 1983 claims against the City Defendants and then turns to the Section 1983 claims against the Hospital Defendants. For the reasons below, summary judgment is granted to Defendants with respect to the Section 1983 claims for municipal liability, false arrest, malicious prosecution, malicious abuse of process, excessive force, and conspiracy. The court sua sponte dismisses the remaining claims of constitutional violations as frivolous.

### A. Section 1983 Claims Against the City Defendants

#### 1. Municipal Liability

Plaintiffs allege that the City of New York ("the City") is liable under 42 U.S.C. § 1983 because it subjected Mr. Jouthe to false arrest and unlawful imprisonment, malicious

prosecution, and malicious abuse of process in violation of Mr. Jouthe's rights under the Fourth and Fourteenth Amendments, and conspired to violate those rights. (Compl. ¶¶ 36-38, 39-50; 51-54 55-56.) Plaintiffs further allege that the City "engaged in a policy, custom or practice of inadequate screening, hiring, retaining, training and supervising its officers, including the individual defendants," and has "tacitly authorized, ratified, and has been deliberately indifferent to, the acts and conduct complained of . . . ." (Id. ¶ 59.) For the reasons below, summary judgment is granted to Defendants on Plaintiffs' Section 1983 claims against the City.

A municipality may not be held liable under Section 1983 on the basis of respondeat superior. Monell v. Dep't of Social Servs., 436 U.S. 658, 690-91 (1978). Rather, a plaintiff must establish both a violation of his or her constitutional rights and that the violation was caused by a municipal policy or custom; that is, that the policy or custom was the actual "moving force" behind the alleged wrongs. See id.; Bd. of the County Comm'rs v. Brown, 520 U.S. 400 (1997). A municipality cannot be held liable where there has been no underlying constitutional violation. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).

As this court recently discussed in Sheikh v. City of New York, Nos. 03-CV-6326, 05-CV-4718 (NGG), 2008 WL 5146645, at *11 (E.D.N.Y. Dec. 5, 2008), a plaintiff must establish one of the following to establish a municipal policy or custom: (1) a formal policy, promulgated or adopted by the City, Monell, 436 U.S. at 690; (2) that an official with policymaking authority took action or made a specific decision which caused the alleged violation of constitutional rights, Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84 (1986); or (3) the existence of an unlawful practice by subordinate officials was so permanent or well settled so as to constitute a "custom or usage" and that the practice was so widespread as to imply the constructive

acquiescence of policymaking officials, City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).

If liability is based on failure to train or supervise, a plaintiff must show "deliberate indifference to the rights of those with whom the municipal employees will come into contact," City of Canton v. Harris, 489 U.S. 378, 388 (1989); Jenkins v. City of New York, 478 F.3d 76, 94 (2d Cir. 2007). To survive summary judgment on a claim of failure to supervise, a plaintiff must establish that "a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious' . . . and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 129 (2d Cir. 2004) (quoting Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995).

It is clear that "[c]onclusory allegations of municipal liability will not defeat a motion for summary judgment on a Monell claim." Shekih, 2008 WL 514664, at *11; see also Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993) ("The mere assertion, however, that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference."). In addition, "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." Ricciutti v. New York City Transit Auth., 124 F.3d 123, 123 (2d Cir. 1997); see also City of Oklahoma v. Tuttle, 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.").

Here, even assuming arguendo that Mr. Jouthe's constitutional rights were violated, Plaintiffs have not provided any evidence in support of their conclusory allegations that Officer Williams – or any other municipal employee – acted pursuant to a municipal policy or custom that was the "moving force" behind the alleged wrongs. Monell, 436 U.S. at 690-91. Nor have Plaintiffs provided any evidence tending to support, even circumstantially, their "mere assertion" that the City has a policy or custom of failing to screen, hire, retain, train, or supervise its employees, Dwares, 985 F.2d at 100, let alone that a policymaker had notice of unconstitutional conduct and evidenced deliberate indifference, Amnesty Am., 361 F.3d at 129. Plaintiffs do not even address Defendants' arguments regarding municipal liability in their memoranda of law. Summary judgment is granted to Defendants on Plaintiffs' Section 1983 claims against the City.

### 2.    False Arrest

Plaintiffs claim that Mr. Jouthe was subjected to false arrest on March 17, 2004 in violation of his rights under the Fourth and Fourteenth Amendments. This claim fails because Mr. Jouthe's arrest was supported by probable cause. "There can be no federal civil rights claim for false arrest where the arresting officer had probable cause." Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995). "[P]robable cause to arrest constitutes justification and is a complete defense to an action for false arrest." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (internal quotation marks omitted).

As this court recently explained in Sheikh, 2008 WL 5146645, probable cause to arrest exists when an officer has "knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007). Moreover, "a claim for false arrest turns only on whether probable

cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of the arrest." Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006). Probable cause is to be assessed on an objective basis. Id.

The existence of probable cause "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." Zellner, 494 F.3d at 368 (quoting Devenpeck v. Alford, 543 U.S. 146, 152 (2004) (emphasis added).) "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." Id. Even where the information on which the officer relies later turns out to be mistaken, probable cause still exists "so long as the arresting officer was reasonable in relying on that information." Bernard v. United States, 25 F.3d 98, 103 (2d Cir. 1994) (citation omitted). Moreover, once a police officer has a reasonable basis for believing there is probable cause to arrest, he or she "is not required to explore and eliminate every theoretically plausible claim of innocence for making an arrest." Ricciutti, 124 F.3d at 128. Thus, whether the suspect was later acquitted of the charges for which he or she was arrested is "irrelevant to the validity of the arrest." Michigan v. DeFillippo, 443 U.S. 31, 36 (1979).

"It is well-settled that police officers have probable cause to arrest if they receive information from a complaining victim or other witness whom they reasonably believe to be telling the truth." Little v. City of New York, 487 F. Supp. 2d 426, 439 (S.D.N.Y. 2007); see also Caldarola v. Calabrese, 298 F.3d 156, 163 (2d Cir. 2002) (collecting cases); Curley v. Village of Suffern, 268 F.3d 65, 70 (2d Cir. 2001) ("When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity.") (internal citations omitted).

Here, it is undisputed that prior to arresting Mr. Jouthe, Officer Williams spoke to several hospital staff regarding the incident in the hallway, including Mr. Johnson and Mr. Goldbourne, both victims. Plaintiffs do not dispute that Mr. Johnson and Mr. Goldbourne spoke with Officer Williams and described the incident with Mr. Jouthe and their resulting injuries. (City Def. 56.1 Statement ¶ 22; MW Dep. 31-39; DG Dep. 60; CJ Dep. 27-32.) Mr. Johnson also testified that he told Officer Williams that Mr. Randazzo fell to the ground when Mr. Jouthe opened his arm into him. (Pl. Opp. 13.) Officer Williams testified that he arrested Mr. Jouthe on the basis of his conversations with the hospital staff and on the injuries to Mr. Randazzo, who was unconscious at the time. (MW Dep. 120, 119.)

While Plaintiffs point out that there is no evidence that the nurse with whom Officer Williams initially spoke witnessed the incident (Pl. Opp. 11), they do not dispute that Officer Williams also spoke to Mr. Johnson and Mr. Goldbourne, two victims. Plaintiffs contend that Mr. Johnson and Mr. Goldbourne lied to Officer Williams because "they were the aggressors," and that Mr. Johnson's testimony that he told Officer Williams that Mr. Randazzo fell from being struck by Mr. Jouthe's opening his arm differs from Ms. Jouthe's testimony that Mr. Randazzo slipped and fell. (Pl. Opp. 12-13.) Viewing the facts in the light most favorable to Plaintiffs, even assuming that Mr. Randazzo slipped and fell without making any contact with Mr. Jouthe, Plaintiffs have raised no facts suggesting that either Mr. Johnson or Mr. Goldbourne should have appeared unreliable to a reasonable police officer. It was objectively reasonable for Officer Williams to believe Mr. Johnson and Mr. Goldbourne's accounts of the incident, given their injuries and those of Mr. Randazzo.

Plaintiffs assert, however, that because hospital staff told Officer Williams not to arrest Mr. Jouthe because he was a child psychiatric patient and might not have understood what he

had done, there was no probable cause for the arrest. (Pl. Opp. 14.) Plaintiffs argue that "Mr. Jouthe's conduct, especially in light of his mental condition, would not constitute a crime," suggesting that Mr. Jouthe was incapable of forming the requisite intent for criminal assault. (Id.) Under New York law, a criminal defendant may introduce expert "psychiatric evidence" in connection with an affirmative defense. N.Y. C.P.L. § 210(1). Whether Mr. Jouthe would have prevailed on such a defense to the charges is a different inquiry – and one which requires expert testimony – from whether a reasonable police officer would have believed, given the facts available to him at the time, that Mr. Jouthe committed an offense and acted with the requisite intent to do so. See Ricciuti, 124 F.3d at 128 (An officer is not required to undertake a "full investigation into plaintiff's state of mind prior to taking action."). Officer Williams is not a psychiatrist. That a child psychiatric patient might not be capable of forming the requisite intent for a particular offense under some circumstances does not mean that Officer Williams was required to determine whether Mr. Jouthe could do so in this instance before making an arrest. Once officers possess facts sufficient to establish probable cause, "they are neither required nor allowed to sit as prosecutor, judge, or jury." Torraco v. Port Auth., 539 F. Supp. 2d 632, 649 (E.D.N.Y. 2008) (citation omitted); Panetta v. Crowley, 460 F.3d 388, 396 (2d Cir. 2006); see also Krause v. Bennett, 887 F.2d 362, 372 (2d Cir. 1989) (noting that an officer's function is to "apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence.").

In sum, it is undisputed that Officer Williams received information prior to the arrest from Mr. Johnson and Mr. Goldbourne regarding their accounts of the incident with Mr. Jouthe, their injuries, and those of Mr. Randazzo. A reasonable officer would have believed this information – given the absence of any indicia that Mr. Johnson and Mr. Goldbourne were

unreliable – and infer that Mr. Jouthe committed the offenses reported by the witnesses. Considering the totality of the circumstances, Officer Williams had sufficient facts to establish probable cause. Summary judgment is therefore granted to the City Defendants on the Section 1983 false arrest claim.

### 3. Malicious Prosecution

Plaintiffs allege that Mr. Jouthe was subjected to malicious prosecution. To prevail on a malicious prosecution claim under Section 1983, a plaintiff must establish the elements of a state law malicious prosecution claim and also show a deprivation of his or her liberty under the Fourth Amendment. Fulton v. Robinson, 289 F.3d 188, 195 (2d Cir. 2002); Murphy v. Lynn, 119 F.3d 938, 944 (2d Cir. 1997). Under New York law, a plaintiff must demonstrate: "(1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." Kinzer v. Jackson, 289 F.3d 188, 143 (2d Cir. 2003). The charges against Mr. Jouthe were ultimately dismissed by motion of the District Attorney pursuant to Section 160.50 of the New York Criminal Procedure Law (City Def. 56.1 Statement ¶ 37 (citing Compl. ¶ 28)), and the parties do not dispute that the proceedings terminated in Mr. Jouthe's favor. The City Defendants claim that Plaintiffs will not be able to satisfy the first, third, and fourth elements of the claim as a matter of law.[10]

---

[10] The parties do not address whether Mr. Jouthe experienced a deprivation of his liberty under the Fourth Amendment as required for a malicious prosecution claim under Section 1983. The Second Circuit has held that this requirement is satisfied through an arrest pursuant to a warrant or, where the arrest is not pursuant to a warrant, any post-arraignment deprivation of liberty. Singer v. Fulton County Sheriff, 63 F.3d at 116-17; see also Douglas v. City of New York, --- F. Supp. 2d ---, No. 06-CV-6134 (DC), 2009 WL 260769, at *7 (S.D.N.Y. Feb. 5, 2009) (denying Section 1983 malicious prosecution claim because there was no indication that plaintiff was arrested pursuant to a warrant or suffered a post-arraignment deprivation of liberty). Because Mr. Jouthe was arraigned in the in-patient unit on March 24, 2004 and released when bail was posted on March 25, 2004, the court assumes that Mr. Jouthe satisfies this element of the malicious prosecution claim.

a.    Initiation/Continuation

As to the first element of a malicious prosecution claim, "[t]here is a presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding." See Brome v. City of New York, No. 02-CV-7184, 2004 WL 502645, at *5-6 (S.D.N.Y. Mar. 15, 2004).  Moreover, "[o]nce a criminal defendant has been formally charged, the chain of causation between the officer's conduct and the claim of malicious prosecution is broken by the intervening actions of the prosecutor, thereby abolishing the officer's responsibility for the prosecution."  Williams v. City of New York, No. 02-CV-3693 (CBM), 2003 WL 22434151, at *6 (S.D.N.Y. Oct. 23, 2003) (citing Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999)).   A plaintiff may overcome the presumption of independent prosecutorial judgment, however, by "demonstrating that the defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." Id.; Espada v. Schneider, 522 F. Supp. 2d 544, 553 (S.D.N.Y. 2007).  A police officer may also be held liable for malicious prosecution if he provides false information to the prosecutor that "influences a decision whether to prosecute." Douglas, 2009 WL 260769 at *6 (citing Chimurenga v. City of New York, 45 F. Supp. 2d 956, 962 (2d Cir. 1988)); see also White v. Frank, 855 F.2d 956, 962 (2d Cir. 1988) (holding that public prosecutor's role does not shield officer from civil liability where officer's statements to prosecutor were "knowingly and maliciously false.").

Courts have thus found triable issues of fact as to the initiation element where a defendant police officer "brought formal charges and had the person arraigned, filled out complaining and corroborating affidavits, swore to and signed a felony complaint, or created false information and forwarded it to prosecutors." Espada, 522 F. Supp. 2d at 553; Ricciutti,

124 F.3d 123; <u>see also</u> <u>Llerando-Phipps v. City of New York</u>, 390 F. Supp. 2d 372, 382-83 (S.D.N.Y. 2005) (citing cases).

Here, it is undisputed that Officer Williams provided information to the District Attorney's office on March 17, 2004, spoke to the District Attorney's office again on March 18, and signed the criminal complaint prepared by the District Attorney's office on March 18. (City Def. 56.1 ¶¶ Statement 32-34; MW Dep. 55, 74.) The complaint charged Mr. Jouthe with three counts of second-degree assault, a felony. (Crim. Compl.) It is also undisputed that the prosecutor's intake form indicates that Mr. Randazzo, Mr. Johnson, and Mr. Goldbourne wanted to prosecute (City Def. 56.1 Statement ¶ 28), although Mr. Johnson testified that he later spoke to the prosecutor and told him that he no longer wanted to press charges (CJ Dep. 32).

At least one court in this district has found the "initiation" element satisfied where an officer swore to and signed a felony complaint. <u>See</u> <u>Cox v. County of Suffolk</u>, 827 F. Supp. 935, 938 (E.D.N.Y. 1993). As the district court in <u>Espada v. Schneider</u> noted, however, "we are concerned with the application of such a rigid rule of causation in this case because [the officer's] actions are consistent with merely reporting the results of his investigation and acting at the behest of the prosecuting attorney." 522 F. Supp. at 553. In <u>Espada</u>, the defendant officer "reported the incident to the Assistant District Attorney, describing his own observations and those of witnesses he interviewed, and swore out the felony complaint." <u>Id.</u> The court noted that the plaintiff had not come forward with any "compelling proof of active and purposive conduct on the part of [the defendant officer], such as encouraging or importuning the prosecutor to act . . . or falsifying statements in support of the complaint in order to justify prosecution." <u>Id.</u> (internal citation omitted). The court ultimately concluded, however, that "although the presumption of independent prosecutorial discretion has been sufficiently rebutted" as to the

initiation element, summary judgment was nonetheless appropriate in light of its conclusions with respect to the third and fourth elements of the malicious prosecution claim – probable cause and malice.  Id.

Plaintiffs have provided no evidence that Officer Williams did anything other than disclose the information within his knowledge – that is, what he learned from speaking with Mr. Johnson and Mr. Goldbourne, and what injuries they and Mr. Randazzo sustained – and sign the complaint.  In addition, Plaintiffs have provided no evidence in support of their conclusory allegations that Officer Williams provided false information to the prosecutor.  See Townes v. City of New York, 176 F.3d at 147 (noting that the chain of causation between the officer's conduct and the malicious prosecution claim is broken "in the absence of evidence that the police officer misled or pressured the [prosecutor] who could be expected to exercise independent judgment.") (emphasis added).  It is undisputed that the criminal complaint Officer Williams signed contained the information that Officer Williams learned about the incident from Mr. Johnson and Mr. Goldbourne.  That Officer Williams provided the prosecutor with the version of the incident told to him by the alleged victims does not demonstrate that he misled or otherwise pressured the prosecutor.

In sum, the court is not entirely persuaded that Plaintiffs have satisfied the initiation element of the malicious prosecution claim simply because Officer Williams swore to and signed the felony complaint against Mr. Jouthe, especially in the absence of evidence that Officer Williams misled the prosecutor.  Nonetheless, even if Plaintiffs have satisfied this element, summary judgment for the City Defendants is appropriate in light of the court's conclusions on probable cause and malice, discussed below.

### b. Probable Cause for the Proceeding

Probable cause is a "complete defense" to a cause of action for malicious prosecution.

Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003). In the context of a malicious prosecution claim, probable cause "has been described as 'such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.'" Harper v. Port Auth., No. 05-CV-5534 (BSJ), 2009 WL 398127, at *4 (S.D.N.Y. Feb. 19, 2009) (quoting Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003)). Courts in this circuit have found that "[a]bsent new countervailing facts, probable cause for arrest establishes probable cause for prosecution." Harper, 2009 WL 398127, at *4 (quotation omitted); see also Espada, 522 F. Supp. at 553 ("The element of probable cause for malicious prosecution entails essentially the same: inquiry as probable cause to arrest, except that the evaluation is made in light of the facts known or believed at the time the prosecution is initiated, rather than at the time of arrest."). Moreover, Plaintiff has provided no evidence that any new facts came to light between Mr. Jouthe's arrest and the commencement of proceedings against him the following day.

In evaluating probable cause to prosecute, some district courts in this circuit have determined that each charge in the criminal complaint must be supported by probable cause. See Espada, 522 F. Supp. at 554 n.10 (after finding that probable cause supported the arrest for disorderly conduct and probable cause existed to prosecute for assaulting a police officer); Allen v. City of New York, 480 F. Supp. 2d 689, 715-16 (S.D.N.Y. 2007). This differs from the inquiry into probable cause to arrest, about which the Second Circuit has noted, "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of the arrest." Jaegly, 439 F.3d at 154. In any event, based on the undisputed evidence described above, the court concludes that probable

cause existed to support the charges in the criminal complaint in light of the facts known at the time it was filed on March 18, 2004, and thus the proceedings against Mr. Jouthe were supported by probable cause.[11]

### c. Malice

While probable cause is a complete defense to a malicious prosecution claim, the court notes that Plaintiffs have provided no evidence that Officer Williams acted with malice, defined in the context of malicious prosecution as commencing a proceeding from "a wrong or improper motive, something other than a desire to see the ends of justice served." Fulton v. Robinson, 289 F.3d 188, 198 (2d Cir. 2002) (quotation marks and citations omitted). Here, Plaintiffs have failed to provide any evidence from which a reasonable finder of fact could conclude that Officer Williams acted with malice. Plaintiffs' allegation in the Complaint that "Defendants acted with malice in initiating criminal proceedings against Plaintiff Hevy Jouthe" is speculative and conclusory and thus does fails to present an issue of material fact.[12] Jeffreys v. City of New York, 426 F.3d 549, 544 (2d Cir. 2005) (citation omitted). Accordingly, summary judgment for the City Defendants is appropriate on Plaintiffs' Section 1983 malicious prosecution claim.

### 4. Malicious Abuse of Process

The elements of a claim under Section 1983 for malicious abuse of process are derived from state law. Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994). Under New York law, a malicious abuse of process claim lies against a defendant who: "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm

---

[11] Mr. Jouthe was arrested for violations of N.Y. Penal L. §120.05(1), second-degree assault; § 120.00(a), assault with intent to cause physical injury, and § 240.26(1), second-degree harassment. (Arrest Report (Dawkins Decl. Ex. I).) The complaint charged him with three counts of violating N.Y. Pen. L. § 120.05(3), second-degree assault, described as causing physical injury to "medical or related personnel in a hospital emergency department" with "intent to prevent . . . [the victim] from performing a lawful duty."

[12] Moreover, Plaintiffs have provided no evidence contradicting Ms. Jouthe's own testimony that she did not feel that the police department intended to harm Mr. Jouthe. (City Def. 56.1 Statement ¶ 61.)

without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." Id. "The crux of a malicious abuse of process claim is the collateral objective element." Douglas, 2009 WL 260769, at *8. To meet this element, "a plaintiff must prove not that defendant acted with an improper motive, but rather an improper purpose – that is, 'he must claim that [the defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution.'" Id. (quoting Savino v. City of New York, 331 F.3d 63, 76 (2d Cir. 2003) (alterations in original). In this case, Plaintiffs' abuse of process claim fails because there is no evidence in the record that in support of Plaintiffs' conclusory allegation in the Complaint that "Defendants arrested Plaintiff Hevy Jouthe in order to obtain a collateral objective outside the legitimate ends of the legal process." See Harper, 2009 WL 398127, at *4 (granting summary judgment to defendants on malicious abuse of process claim where the plaintiff "has not even suggested to the Court what any alleged collateral purpose could possibly be."). Plaintiffs' claim for malicious abuse of process is without merit, and summary judgment is granted to the City Defendants.

### 5. Excessive Force

A plaintiff may bring a claim for excessive force used to make an arrest under Section 1983 pursuant to the provisions of the Fourth Amendment. Graham v. Connor, 490 U.S. 386, 394 (1989). A police officer's use of force is excessive if it is objectively unreasonable in light of the facts and circumstances confronting that officer, without regard to the underlying intent or motivation of the officer. Id. at 397. The analysis considers the totality of the circumstances, "including the severity of the crime at issue [and] whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest." Sullivan v. Gagnier, 225 F.3d 161, 165 (2d Cir. 2000). "To sustain a claim of excessive force, a plaintiff must present

sufficient evidence to establish that the alleged use of force is objectively sufficiently serious or harmful enough to be actionable." Drummond v. Castro, 522 F. Supp. 2d 667, 678 (S.D.N.Y. 2007) (internal quotation marks omitted). Moreover, "a de minimis use of force will rarely suffice to state a Constitutional claim." Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993).

Plaintiffs' Complaint does not explicitly assert that Defendants subjected Mr. Jouthe to excessive force, but the factual allegations state that "while at the hospital . . . the City Defendants unlawfully restrained, touched, choked, hit and injured Plaintiff Hevy Jouthe without justification while Plaintiff Nicole Jouthe was present." (Compl. ¶ 22.) During discovery, Plaintiffs admitted that that neither Ms. Jouthe nor Ms. Jouthe observed any NYPD officers choke, kick, punch, or threaten Mr. Jouthe, or threaten bodily harm. (City Def. 56.1 Statement ¶¶ 41-48.) In their memorandum of law, Plaintiffs contend only that Officer Williams's application of handcuffs to Mr. Jouthe during the arrest constitutes an excessive use of force, arguing that Mr. Jouthe was already in restraints and thus could not escape or resist. (Pl. Opp. 16-17.) The court construes Plaintiffs' excessive force claim to arise out of Officer Williams's handcuffing of Mr. Jouthe pursuant to arrest at the hospital on March 17, 2004, given the allegations in the Complaint that Mr. Jouthe was "restrained" without justification on that date.[13]

---

[13] Plaintiffs' memorandum of law does not contend, nor does the Complaint allege, that Mr. Jouthe was subjected to excessive force by being kept in handcuffs from March 17 to March 24 at the in-patient unit at Hillside Hospital. Moreover, during discovery, Plaintiffs admitted that "Hevy Jouthe does not allege excessive force was used against him at any time after he left Long Island Jewish Hospital on March 17, 2004." (Response to Defendants' Request for Admission Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, at No. 22 (Declaration of Julinda Dawkins ("Dawkins Decl.") Ex. N) (Docket Entry #34).) The court thus construes Plaintiffs' excessive force claim against the City Defendants to constitute only Officer Williams's handcuffing of Mr. Jouthe during the arrest on March 17, 2004.

Out of an abundance of caution, the court notes that the parties' 56.1 Statements and responses do not set forth any facts relating to the circumstances under which Mr. Jouthe was kept in handcuffs at Hillside from March 18 to March 24, other than that medical staff performed assessments to make sure that Mr. Jouthe's wrists were not too restricted, and that no redness or soreness was observed. (See Inpatient Attending/NP Progress Notes, Inpatient Fellow Progress Note, and Progress Notes (Dawkins Decl. Ex. M).) The record also demonstrates that during his time in the in-patient unit, Mr. Jouthe was also kept in restraints referred to by medical staff as "foot cuffs" and "shackles." (See id.) The record does not specify the nature of the restraints on Mr. Jouthe's ankles and whether

Courts have noted that "[r]outine handcuffing 'at the time of arrest, absent something more, cannot constitute a cognizable excessive force claim.'" <u>Gil v. County of Suffolk</u>, 590 F. Supp. 2d 360, 371 (<u>quoting</u> <u>Stokes v. City of New York</u>, 2007 WL 1300983, at *11 (E.D.N.Y. May 3, 2007)). Courts have found that handcuffing can give rise to a Section 1983 excessive force claim where a plaintiff suffers an injury as a result. <u>See</u>, <u>e.g.</u>, <u>Gonzalez v. City of New York</u>, No. 98-CV-3084 (ILG), 2000 WL 516682, at *4 (E.D.N.Y. Mar. 7, 2000) (denying summary judgment where plaintiff presented expert testimony that he suffered permanent injury from handcuffs and plaintiff requested that handcuffs be loosened); <u>see</u> <u>also</u> <u>Esmont v. City of New York</u>, 371 F. Supp. 2d 202, 214-15 (E.D.N.Y. 2005) (noting that "[p]lacing handcuffs on an arrestee tight enough to cause nerve damage may, however, constitute excessive force in violation of the Fourth Amendment" and citing cases).

Courts have granted summary judgment dismissing claims of excessive force, however, where the handcuffing resulted in no injury or only minor injuries. <u>See</u>, <u>e.g.</u>, <u>Drummond v. Castro</u>, 522 F.Supp.2d 667, 679 (S.D.N.Y. 2007) (noting that "Plaintiff fails to present any evidence apart from the tight handcuffs that would lead a reasonable juror to find that police used excessive force" and that plaintiff lacked injury from the tight handcuffs); <u>Hamlett v. Town of Greenburgh</u>, No. 05-CV-3215 (MDF), 2007 WL 119291, at *3 (S.D.N.Y. Jan. 17, 2007) (finding numbness resulting from handcuffs insufficient to constitute excessive force); <u>Wilder v. Village of Amityville</u>, 288 F. Supp. 2d 341, 344 (E.D.N.Y. 2003) (granting summary judgment to defendants where handcuffing resulted in inflammation of plaintiff's wrists for twenty-four hours but plaintiff did not require medical attention). As one court explained, "if the application of

---

they were applied and/or imposed by law enforcement or medical staff. (<u>See</u> <u>id.</u>) There are no allegations or indications in the record that the restraints on Mr. Jouthe's ankles caused any injury to Mr. Jouthe.

handcuffs was merely uncomfortable or caused pain, that is generally insufficient to constitute excessive force." Gonzalez, 2000 WL 516682, at *4.

In Esmont v. City of New York, my colleague Judge Sifton proposed that "in evaluating the reasonableness of handcuffing, a Court is to consider evidence that: (1) the handcuffs were unreasonably tight; (2) the defendants ignored the [plaintiff's] pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists." 371 F. Supp. 2d at 215 (emphasis in original). Judge Sifton also noted that the court found no case "permitting a plaintiff to establish an excessive force claim based on tight handcuffing in the absence of a request to loosen them." Id. In Esmont, the court granted summary judgment to defendants on the excessive force claim, because the plaintiff failed to present evidence that she requested that her handcuffs be loosened, there was therefore no evidence that any defendant unreasonably ignored her complaints of pain, and the plaintiff's claim of "diminished use of her left wrist" was unsubstantiated by medical evidence. See id. at 215.

Here, Plaintiffs' only evidence in support of that Mr. Jouthe was subjected to excessive force is Mr. Jouthe's testimony. Mr. Jouthe testified that he had cuts or bruises, that his wrist was "red and looked like – that was about it just red it was too tight on my wrist and it hurt," and that the cuts and bruises "healed that was such a long time ago." (HJ Dep. 228-229.) Even accepting Mr. Jouthe's testimony as true, and assuming that the handcuffing on March 17 caused the injuries Mr. Jouthe described, Plaintiffs have provided no medical evidence indicating that Mr. Jouthe experienced anything more than de minimis, temporary injuries as a result of being handcuffed. Moreover, Mr. Jouthe testified that handcuffs were loosened when he said that the handcuffs were too tight, although Mr. Jouthe's testimony does not indicate to whom he

requested this, and whether he did so following his arrest on March 17 or after he was transferred to Hillside Hospital. (HJ Dep. 229.)

In addition, Plaintiffs do not dispute Officer Williams's testimony that no medical personnel asked him to loosen the handcuffs. (City Def. 56.1 Statement ¶ 25.) Plaintiffs argue that their "proof" of the excessive force claim is that "the hospital [medical staff] requested that the handcuffs be removed," which Officer Williams did not do (see DC Dep. 38-39), but the record evidence does not indicate why hospital staff requested removal of the handcuffs. (Pl. Opp. 17.) The court has found no testimony from medical staff and no indication anywhere in Mr. Jouthe's medical records that the handcuffs were injuring Mr. Jouthe or causing pain, or even restricting his circulation. (See Hospital Def. Rev. 56.1 Statement ¶ 9.) Viewing the evidence in the light most favorable to Plaintiffs, the court nonetheless concludes that Plaintiffs have failed to provide evidence that Mr. Jouthe suffered more than de minimis injuries as a result of being handcuffed on March 17, 2004.

Plaintiffs also argue that it was unreasonable to handcuff Mr. Jouthe incident to arrest because Mr. Jouthe was already in restraints. It is irrelevant that Mr. Jouthe was already restrained, however, because Plaintiffs have produced no evidence regarding whether Officer Williams was familiar with the type of restraints used by the hospital, their reliability, and whether they were as effective as handcuffs. Mr. Jouthe was 6'5" and weighed 350 pounds. Given that Plaintiff was accused of assaulting several hospital staff members, it was reasonable for Officer Williams to handcuff Mr. Jouthe for his own safety, Mr. Jouthe's safety, and the safety of hospital staff. "Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out." Esmont, 371 F. Supp. 2d at 214. And as discussed above, Plaintiffs have provided no evidence

indicating that Mr. Jouthe suffered more than de minimis injuries, no evidence that anyone

ignored Mr. Jouthe's request to loosen the handcuffs, and no evidence that the request to loosen

the handcuffs was even directed at Officer Williams or occurred while Mr. Jouthe was

handcuffed on March 17.  In sum, Plaintiffs have provided no evidence that Officer Williams

used force against Mr. Jouthe on March 17, 2004 beyond routine handcuffing, which is proper

under the Fourth Amendment.  The court thus grants summary judgment to the City Defendants

on the excessive force claim.

**6.    Conspiracy**

Conspiracy to deprive a person of his or her constitutional rights is actionable under

Section 1983.  Pangburn v. Culbertson, 200 F.3d 65, 76 (2d Cir. 1999).  To state such a claim, a

plaintiff must allege: "(1) an agreement between two or more state actors or between a state actor

and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act

done in furtherance of that goal causing damages."  Id.; accord Ciambriello v. County of Nassau,

292 F.3d 307, 324-25 (2d Cir. 2002).  "Complaints containing only conclusory, vague, or general

allegations that the defendants engaged in a conspiracy to deprive the plaintiff of his

Constitutional rights are properly dismissed."  Ciambriello, 292 F.3d at 325 (quoting Dwares,

985 F.2d at 100).

Here, Plaintiffs' Complaint alleges simply that "Defendants conspired to deprive Hevy

Jouthe of the aforementioned constitutional rights."  (Compl. ¶ 56.)  In their memorandum of

law, Plaintiffs state that "Mr. Johnson and Mr. Goldbourne wanted the plaintiff arrested.  PO

Williams wanted Mr. Jouthe arrested.  They worked together for this to happen.  Therefore, all

three prongs are met."  That Mr. Johnson and Mr. Goldbourne made statements to Officer

Williams and indicated that they wanted to press charges against Mr. Jouthe (City Def. 56.1

Statement ¶ 28) – and that Officer Williams arrested Mr. Jouthe – is insufficient evidence that Defendants agreed among themselves to inflict an unconstitutional injury on Mr. Jouthe. See, e.g., Nat'l Cong. For Puerto Rican Rights v. City of New York, 75 F. Supp. 2d 154, 168 (E.D.N.Y. 1999) (dismissing conspiracy claim for failure to allege a meeting of the minds).

Moreover, to succeed in a Section 1983 conspiracy claim, a plaintiff must prove not only a conspiracy, but an actual deprivation of a constitutional right. Celestin v. City of New York, 581 F. Supp. 2d 420, 434 (E.D.N.Y. 2008); Martinez v. Golding, 499 F. Supp. 2d 561, 570 (S.D.N.Y. 2007) ("[E]ven if we assume the accuracy of plaintiff's conspiracy allegations, our conclusion that there was probable cause to arrest and prosecute plaintiff is fatal to his claim."). Here, Plaintiff's allegations that Mr. Johnson, Mr. Goldbourne, and Officer Williams "wanted" Mr. Jouthe arrested, even if true, do not give rise to Section 1983 liability, given the court's determination that Mr. Jouthe's arrest was supported by probable cause. The court thus grants summary judgment to the City Defendants on the Section 1983 conspiracy claim.

### 7.    Qualified Immunity of the City Defendants

Qualified immunity "'shields police officers acting in their official capacity from suits for damages . . . unless their actions violate clearly established rights of which an objectively reasonable official would have known.'" Jones v. Parmley, 465 F.3d 46, 55 (2d Cir. 2006) (quotation omitted). Having concluded that Officer Williams did not violate Mr. Jouthe's constitutional rights, the court need not reach the question of qualified immunity. Sheikh, 2008 WL 5146645, at *10.

### B.    Section 1983 Claims Against the Hospital Defendants

Plaintiffs have alleged numerous causes of action pursuant to Section 1983 against the Hospital Defendants: a deprivation of various constitutional rights including excessive force,

false arrest, malicious prosecution, malicious abuse of process, conspiracy, and municipal liability.  (Compl. ¶¶ 30-35, 39-50; 51-54, 55-56, 57-66.)  It is undisputed that none of the Hospital Defendants is a municipality, so summary judgment is granted to Defendants on the claim of municipal liability under Section 1983.  Regarding the remaining Section 1983 claims, the court grants summary judgment to the Hospital Defendants, because those defendants did not act under color of state law as required by Section 1983.

### 1.     Section 1983's "Under Color of State Law" Requirement

Section 1983 creates no substantive rights, but provides a "mechanism for enforcing a right or benefit established elsewhere."  Morris-Hayes v. Bd. of Educ., 423 F.3d 153, 159 (2d Cir. 2005) (citation omitted).  To state a cause of action under Section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived him or her of rights, privileges, or immunities secured by the Constitution.  See Palmieri v. Lynch, 392 F.3d 73, 78 (2d Cir. 2004).

For a private individual or entity to act under color of state law, the allegedly unconstitutional conduct of which plaintiff complains must be "fairly attributable to the state." Tancredi v. Metro Life Ins. Co., 316 F.3d 308, 312 (2d Cir. 2003), cert. denied, 539 U.S. 942 (2003).  There must be "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself."  Id. (citations and internal quotation marks omitted).   Such a nexus is found:

> where the state exercises coercive power over, is entwined in [the] management or control of, or provides significant encouragement, either overt or covert to, a private actor, or where the private actor operates as a willful participant in joint activity with the State or its agents, is controlled by an agency of the State, has been delegated a public function by the state or is entwined with governmental policies.

Id. at 313 (citation and internal quotation marks omitted).

## 2. Long Island Jewish Medical Center

It is well-established that "[p]rivate employers are not liable under 1983 for the constitutional torts of their employees," unless the plaintiff proves that "action pursuant to official . . . policy of some nature caused a constitutional tort." Rojas v. Alexander's Department Stores, Inc., 924 F.2d 406, 408 (2d Cir. 1990) (emphasis in original) (internal quotation marks and citation omitted). Here, it is undisputed that LIJMC is a New York corporation and that Mr. Johnson, Mr. Goldbourne, and Mr. Randazzo were employees of LIJMC on March 17, 2004. (Compl. ¶¶ 15, 16; Hosp. Def. Ans. ¶ 7 (Docket Entry #6); Affidavit of Marianne Ambookan (Hosp. Def. Mot. Ex. D).) Plaintiffs have not alleged – let alone provided evidence – that LIJMC maintained an unconstitutional policy under which any individual named defendant acted to deprive Plaintiffs of a constitutional right. Therefore, no viable Section 1983 claim has been asserted against LIJMC on the basis of either vicarious liability or its own policies. See Fisk v. Letterman, 401 F. Supp. 2d 362, 375 (S.D.N.Y. 2005) (dismissing Section 1983 against corporate defendants where plaintiff failed to allege "a policy of violating individuals' civil rights"). The court grants summary judgment to Long Island Jewish Medical Center on Plaintiffs' Section 1983 claims.[14]

## 3. Individual Hospital Defendants

The Second Circuit has noted that "[i]n certain contexts, private actors' conduct can be considered state action and thus governed by constitutional constraints that normally apply only

---

[14] While Plaintiffs also name as Defendants Long Island Jewish Hospital and North Shore-Long Island Jewish Health System, they refer to LIJMC and those two entities collectively in their pleadings and memoranda of law as "Hospital," and have not indicated any separate claims against Long Island Jewish Hospital and North Shore-Long Island Jewish Health System. As noted above, Long Island Jewish Hospital is part of LIJMC, and LIJMC is a member of the North Shore-Long Island Jewish Health System.

     Plaintiffs have alleged no unconstitutional policies of LIJH or North Shore-Long Island Jewish Health System, and there can be no respondeat superior liability under Section 1983. Rojas, 924 F.2d at 408 (citing Monell, 436 U.S. at 691). The court thus dismisses the Section 1983 claims against Long Island Jewish Hospital and North Shore-Long Island Jewish Health System.

to state and local governments." LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 432-33 (2d Cir.

1995). As noted above, private individuals are liable under Section 1983 where the "private

actor operates as a willful participant in joint activity with the State or its agents, is controlled by

an agency of the State, has been delegated a public function by the state or is entwined with

governmental policies." Tancredi, 326 F.3d at 313 (citation and internal quotation marks

omitted); see also Kadic v. Karadzic, 70 F.3d 232, 245 (2d Cir. 1995) ("A private individual acts

under color of law within the meaning of section 1983 when he acts together with state officials

or with significant state aid.")

Plaintiffs make two arguments in support of their contention that the individual hospital

Defendants are liable under Section 1983. First, they contend that Mr. Johnson, Mr. Goldbourne,

and Mr. Donovan, are state actors because they are "hospital security guards" and that they are

"safety officers and designated as special policemen" pursuant to Section 7.25(a) of the New

York Mental Hygiene Law, and that the Hospital Defendants have failed to establish that they

are not "special policemen." (Pl. Opp. 24-25.) Second, they argue that Mr. Johnson and Mr.

Goldbourne "worked together" with Officer Williams to arrest Mr. Jouthe and thus are liable for

conspiracy under Section 1983. (Pl. Opp. 25.) The court addresses Plaintiffs' Section 1983

claims against Mr. Johnson and Mr. Goldbourne and then turns to the claims against Mr.

Randazzo.

### a.        Mr. Johnson and Mr. Goldbourne

First, regarding whether Mr. Johnson and Mr. Goldbourne were designated "safety

officers" under Section 7.25(a) of the New York Mental Hygiene Law, it is undisputed that Mr.

Johnson was a unit aide and Mr. Goldbourne was an emergency technician; neither was a

security guard. There is simply no allegation, or for that matter any plausible scenario, under

which Mr. Johnson and Mr. Goldbourne, in their capacities as a unit aid and emergency

technician at LIJMC, would be designated as "safety officers" by the "commissioner or director

of in-patient facilities in the office of mental health . . . to act as special policemen . . . ." N.Y.

Mental Hyg. L. § 7.25(a).  While at least two district courts have found "special patrolmen" to be

state actors for purposes of Section 1983 liability, see Temple v. Albert, 719 F. Supp. 265, 267

(S.D.N.Y. 1989); Rojas v. Alexander's Dep't Store, Inc., 654 F. Supp. 856, 858 (E.D.N.Y.

1986), there is no evidence that either Mr. Johnson or Mr. Goldbourne was designated as a

"safety officer."[15]

Plaintiffs' contention that Defendants, as the movants, have the burden of demonstrating

that they are "not special policemen" is misplaced.  (Pl. Opp. 25.)  Defendants' burden is to show

an absence of a genuine issue of material fact, Adickes, 398 U.S. at 157; where Plaintiffs have

provided no evidence in support of their claim that Mr. Johnson and Mr. Goldbourne acted

"under color of state law," summary judgment on the Section 1983 claims is appropriate, Gallo,

22 F.3d at 1223-24.

Plaintiffs have provided no evidence that Mr. Johnson and Mr. Goldbourne were

controlled by the state or otherwise acted pursuant to state authority.  First, on the excessive

force claim under Section 1983, Plaintiffs have provided no evidence that Mr. Johnson and Mr.

Goldbourne were acting "together with state officials or with the aid of the state," or otherwise

acting pursuant to state authority, in using force to restrain Mr. Jouthe.[16]  It is undisputed that the

---

[15] In any event, the "special patrolmen" in Temple and Rojas were designated as such by the police commissioner pursuant to Section 434a-7.0 of the New York City Administrative Code, which authorized them to "possess all the powers and discharge all the duties of the [police] force, applicable to regular patrolmen."  Temple, 719 F. Supp. at 267; Rojas, 654 F. Supp. at 858.  In contrast, the powers allotted to "safety officers" under Section 7.25(a) of the Mental Hygiene Law are not that broad; rather, safety officers have the powers of "peace officers," as set forth in Section 2.20 of the New York Criminal Procedure Law.

[16] As noted above, Ms. Jouthe testified that she did not see hospital staff hit, punch, or kick Mr. Jouthe; that it appeared just that they were trying to stop him from moving; and that they were having difficulty bringing him

incident in the hallway occurred prior to the arrival of the police. Second, on the false arrest and malicious prosecution claims under Section 1983, that Mr. Johnson and Mr. Goldbourne provided Officer Williams with information regarding the incident that led to Mr. Jouthe's arrest does not give rise to Section 1983 liability. "A private party who calls police officers for assistance or provides them with information that may lead to an arrest of an individual does not become a state actor rendering that party liable under § 1983 to the person detained, unless the police officers were improperly influenced or controlled by the private party." Fisk, 401 F. Supp. 2d at 367. Viewing the evidence in the light most favorable to Plaintiffs, there is nonetheless no evidence in the record that Mr. Johnson and Mr. Goldbourne "improperly influenced or controlled" the police. While their account of the incident differs from that of Ms. Jouthe with respect to whether Mr. Jouthe injured Mr. Randazzo, it is undisputed that Mr. Johnson and Mr. Goldbourne themselves suffered injuries in the course of restraining of Mr. Jouthe, and that they provided this information to Officer Williams. Third, on the malicious abuse of process claim under Section 1983, there is no evidence in the record that either Mr. Johnson or Mr. Goldbourne "employ[ed] regularly issued legal process" to Mr. Jouthe or intended to obtain an improper "collateral objective," let alone that they did so in connection with the state or with the aid of the state. Finally, regarding the Section 1983 conspiracy claims, while a private actor may be liable under some circumstances for conspiracy under Section 1983, Pangburn, 200 F.3d at 76, the court grants summary judgment to Mr. Johnson and Mr. Goldbourne for the same reasons it granted summary judgment to Officer Williams on that claim, discussed above. Summary judgment is thus granted to Hospital Defendants Mr. Johnson and Mr. Goldbourne on all of Plaintiffs' Section 1983 claims against them.

down. (1NJ Dep. 39-40.) She testified that it did not look like they were trying to injure him in any way. (Id. at 40.)

b.    Mr. Randazzo

It is undisputed that Mr. Randazzo was a security guard at LIJMC.  Courts have found

that the acts of private security guards generally do not constitute state action for purposes of

section 1983.  See Bishop v. Toys "R" Us-NY, LLC, No. 04-CV-9403 (PKC), 2009 WL 440434,

at *11(S.D.N.Y. Feb. 19, 2009) (citing cases).  Private security guards are not liable under

Section 1983 unless they are "willful participants in the joint activity of the State or its agents,"

Guiducci v. Kohl's Dep't Stores, 320 F. Supp. 2d 35, 37 (quotation omitted), or are "given the

authority of state law," Royster v. Rochdale Village Co-op, No. 08-CV-1367 (CBA), 2008 WL

1787681, at *2 (E.D.N.Y. Apr. 17, 2008).  As noted above, two district courts have found

security guards to be state actors under Section 1983 where the guards were designated "special

patrolmen" who were given all of the powers of police officers.  Temple, 719 F. Supp. at 267;

Rojas, 654 F. Supp. at 858.  Courts have found this explicit designation of power the "exception

that proves the general rule" that security guards are not subject to liability under Section 1983.

Guiducci, 320 F. Supp. at 37.  The Complaint does not allege, and Plaintiffs have come forward

with no evidence, that Mr. Randazzo was designated as a "safety officer" or "special policeman"

pursuant to Section 7.25(a) of New York's Mental Hygiene Law.

While the cases cited above concern private security guards at stores, the court notes that

one court dismissed Section 1983 claims against security guards at LIJMC who allegedly

assaulted and detained the plaintiff pending his arrest by the NYPD on the grounds that "the

allegedly close relationship between the police and LIJ's [Long Island Jewish Medical Center]

security guards and State regulation of LIJ, a private hospital, are not a sufficient basis upon

which to conclude that LIJ's officers acted under color of State law or constituted state action for

Fourteenth Amendment purposes."  Estes El v. Long Island Jewish Medical Center, No. 95-CV-

1047 (LAK), 1995 WL 217545, at *1 (S.D.N.Y. Apr. 12, 1995) (dismissing constitutional and Section 1983 claims pursuant to Rule 12(b)(6).).

In the absence of any evidence that Mr. Randazzo was a designated "safety officer," the court concludes that Mr. Randazzo is not subject to liability under Section 1983. In any event, according to Plaintiffs' version of events, Mr. Randazzo fell and injured himself prior to making any physical contact with Mr. Jouthe, and it is undisputed that Mr. Randazzo remained unconscious when Officer Williams arrived and arrested Mr. Jouthe. Therefore, viewing the facts in the light most favorable to Plaintiffs, there is no plausible factual scenario under which Mr. Randazzo could have caused any of the alleged constitutional violations, even if he were a state actor. Summary judgment is therefore granted to Mr. Randazzo on the Section 1983 claims.

### C.      Section 1983 Claims Against Unnamed and "Unknown" Defendants

None of the parties has addressed any claims against any other police officers other than Officer Williams, or any hospital employees other than Mr. Johnson, Mr. Goldbourne, and Mr. Randazzo. Out of an abundance of caution, the court notes that the caption of Plaintiffs' Complaint names as defendants "other police officers John and Jane Doe, the names unknown at this time" and "other unknown" defendants. The Complaint does not allege that any particular person other than the four named individual defendants violated Mr. Jouthe's rights, nor do the factual allegations describe the actions of any person other than the four named defendants. Because personal involvement by the defendants in any alleged constitutional violation is a prerequisite to an award of damages under Section 1983, see, e.g., Hernandez v. Keane, 341 F.3d 137, 144-45 (2d Cir. 2003), any remaining claims against the unnamed and unknown defendants must be dismissed. See Fisk, 401 F. Supp. 2d at 375 (dismissing Section 1983 claim against

certain named employees where plaintiff's allegations referred to the defendants collectively and where only one named individual was alleged to have violated the plaintiff's rights); Johnson v. Meachum, 839 F. Supp. 953, 958 (D. Conn. 1993) (dismissing claims against an unnamed defendant and noting that "the court is at a loss to find any factual allegations in the Complaint which even mention this defendant").

### D.     Plaintiffs' Remaining Claims of Constitutional Violations

The first claim for relief in Plaintiffs' Complaint, "deprivation of rights under 42 U.S.C. § 1983," incorporates the factual allegations and states that "[a]ll of the aforementioned acts deprived Plaintiff Hevy Jouthe of the rights, privileges and immunities guaranteed . . . by the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution . . . ."  (Compl. ¶ 32.)  As set forth above, the court has evaluated Plaintiffs' claims under the Fourth and Fourteenth Amendments regarding the claims for false arrest, malicious prosecution, malicious abuse of process, excessive force, and conspiracy.  Regarding Plaintiffs' remaining claims of "deprivations of rights" under other amendments to the Constitution, the court dismisses these claims as frivolous.[17]  A claim is frivolous if it "lacks an arguable basis either in law or fact." Denton v. Hernandez, 504 U.S. 25, 31 (1992) (citation omitted); see also Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998) (claim is frivolous when it is "based on an indisputedly meritless legal theory," meaning that it "lacks an arguable basis in law . . .  or a dispositive defense clearly exists on the face of the complaint.") (internal citations omitted). Here, the Complaint does not allege any factual or legal basis for such claims.

---

[17] Although the parties have not addressed any of these claims in their Motions and memoranda of law, the court dismisses them sua sponte.  See Fitzgerald v. First East Seventh Street Tenants Corp., 221 F.3d 362, 363-64 (2d Cir. 2000) (noting that district court may sua sponte dismiss frivolous case, even where plaintiff has paid the filing fee).

First, any claim under the First Amendment must be dismissed, because there is no allegation that Plaintiffs engaged in speech or expression that was constitutionally protected, let alone that such speech or expression resulted in a retaliatory action taken against them by state actors.  See Camacho v. Brandon, 317 F.3d 153, 160 (2d Cir. 2003) (describing elements of First Amendment retaliation claim under 42 U.S.C. § 1983.)

Second, any claim under the Fifth Amendment must be dismissed, because the Fifth Amendment applies only to the federal government, and Plaintiffs have alleged no federal action.[18]  Cortlandt v. Westchester County, 07-CV-1783 (MDF), 2007 WL 3238674, at *5 (S.D.N.Y. Oct. 31, 2007); Manbeck v. Katonah-Lewisboro Sch. Dist., 435 F. Supp. 2d 273, 276 (S.D.N.Y. 2006) ("The Fifth Amendment does not regulate the activities of state officials or state actors.").

Third, any claim under the Eighth Amendment must be dismissed, because the use of allegedly excessive force occurred in the context of an arrest; that claim is properly construed as arising under the Fourth Amendment.  Li v. Aponte, No. 05-CV-6237 (NRB), 2008 WL 4308127, at *11 (S.D.N.Y. Sept. 16, 2008) (dismissing Eighth Amendment claim as "patently frivolous" where the allegedly excessive force was used during an arrest); Graham, 490 U.S. at 385 ("Where, as here, the excessive force claim arises in the context of an arrest . . . it is most properly characterized as one invoking the protections of the Fourth Amendment . . . ."); see also Watkins v. City of Buffalo, No. 95-CV-0816 (ESC), 1999 WL 1068239, at *6 (W.D.N.Y. Nov. 12, 1999) (treating purported "Eighth Amendment" claim as false arrest/excessive force claim

---

[18] Nowhere in Plaintiffs' Complaint is there any allegation of a violation of due process.  Even if the court were to construe Plaintiffs' purported Fifth Amendment claim as a due process claim under the Fourteenth Amendment, however, such a claim would be without merit, because this court concludes that Mr. Jouthe's arrest was supported by probable cause.  As this court noted in Sheikh, "[w]here, as here, probable cause has been clearly established, there can be no claim for denial of either the procedural or substantive right to due process."  2008 WL 5146645, at *8 (quoting Harris v. County of Nassau, No. 07-CV-1866 (LDW), 2008 WL 4425284, at *5 (Sept. 29, 2008)).

under the Fourth and Fourteenth Amendments).  In sum, Plaintiffs' remaining constitutional claims are dismissed as frivolous.

### E.    State-Law Claims Against All Defendants

Plaintiffs also allege ten claims against all Defendants arising under New York state law: false arrest; unlawful imprisonment; malicious prosecution; malicious abuse of process; intentional infliction of emotional distress; negligent screening, hiring, and retention; negligent training and supervision; negligence; respondeat superior liability; and assault and battery. Having granted summary judgment on all federal claims to all Defendants, the court declines to exercise pendent jurisdiction over the state-law claims.  See 28 U.S.C. § 1367(c); Castellano v. Bd. of Trustees, 937 F.2d 752, 758 (2d Cir. 1991) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.") (citation omitted).  The pendent state-law claims are thus dismissed.

### F.    Claims of Ms. Jouthe Individually

Having granted summary judgment to Defendants on all Section 1983 claims, the court addresses, out of an abundance of caution, the inclusion of Ms. Jouthe as a plaintiff in her own right.  Ms. Jouthe is listed as a plaintiff both on behalf of Mr. Jouthe as his guardian ad litem and as an individual plaintiff.  It is undisputed that Ms. Jouthe has standing to sue on behalf of Mr. Jouthe as Mr. Jouthe's guardian ad litem.  Plaintiffs have not alleged any facts, however, demonstrating that Ms. Jouthe has standing to sue any Defendants for any claim under Section 1983 as an individual plaintiff.  "[T]he irreducible constitutional minimum" of standing contains three elements: (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that the injury will be redressed by a favorable decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  "It is not sufficient for plaintiffs

to allege 'a generalized grievance against allegedly illegal government conduct.'" <u>Kessler v. Grand Cent. Dist. Management Ass'n, Inc.</u>, 960 F. Supp. 760, 766 (S.D.N.Y. 1997) (<u>quoting United States v. Hays</u>, 515 U.S. 737 (1995)).  The necessity of a personal injury to the plaintiff is required under Section 1983 to establish standing.  <u>Warth v. Seldin</u>, 442 U.S. 490 (1975).  It is undisputed that Ms. Jouthe was not arrested or subjected to excessive force.  (City Def. 56.1 Statement ¶¶ 51, 52.)  Therefore, there is no claim that she was subjected to false arrest, malicious prosecution, malicious abuse of process, excessive force, or conspiracy in violation of her constitutional rights.  Because Ms. Jouthe suffered no injury to herself that is cognizable under Section 1983, the court concludes that she lacks standing to pursue any Section 1983 claims.[19]

## IV.   CONCLUSION

For the reasons above, Defendants' Motions are GRANTED with respect to Plaintiffs' Section 1983 claims, and the court declines to exercise jurisdiction over the state-law claims. The Clerk of the Court is directed to close the case.

SO ORDERED.

                                        __/s/ Nicholas G. Garaufis__
Dated: Brooklyn, New York               NICHOLAS G. GARAUFIS
       March <u>10</u>, 2009                United States District Judge

---

[19] Having declined to exercise jurisdiction over the state-law claims, the court takes no position on whether Ms. Jouthe has standing to pursue any such claims against Defendants.  The only allegation in the Complaint  that mentions Ms. Jouthe is the factual allegation that "Plaintiff Hevy Jouthe and Plaintiff Nicole Jouthe sustained, <u>inter alia</u>, extreme emotional distress, embarrassment, humiliation, physical and mental injuries, and deprivation of <u>his</u> constitutional rights."  (Compl. ¶ 29) (emphasis added).  Plaintiffs' eleventh cause of action, intentional infliction of emotional distress, does not mention Ms. Jouthe, noting that "[t]he aforementioned conduct was intentional and for the sole purpose of causing severe emotional distress to Plaintiff Hevy Jouthe."  (<u>Id.</u> ¶ 96.)